**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br> v.<br><br>RONALD VAN DEN HEUVEL, and GREEN BOX NA DETROIT, LLC,<br><br>  Defendants. | Case No. 17-cv-1261<br><br>Jury Trial Demanded |

## COMPLAINT

The United States Securities and Exchange Commission alleges as follows:

### Nature of the Action

1. This case involves misrepresentations and the misappropriation of millions of dollars of investor funds by defendant Ronald Van Den Heuvel. He took advantage of investors who believed that they were investing in a new way to recycle post-consumer waste.

2. Van Den Heuvel lured investors with promises that he would use their funds for an eco-friendly recycling process called the Green Box Process. He claimed that the Green Box Process would take food-contaminated waste and convert it into usable products, such as recycled paper. Van Den Heuvel represented that he would use investor funds to buy equipment, open a Green Box facility, and ultimately help to create a green solution for post-consumer waste.

3. In reality, Van Den Heuvel misappropriated a substantial percentage of the funds contributed by investors. Instead of using investor funds to implement the Green Box Process,

Van Den Heuvel used a significant portion of their investments for improper purposes, such as a Cadillac Escalade, payments to his ex-wife, overdue taxes, Green Bay Packers tickets, and cash for himself.

4.     Van Den Heuvel took advantage of foreign investors who put their trust in him. In particular, in 2012 and 2014, Van Den Heuvel raised over $3 million from a Canadian asset management firm named Cliffton Equities.  Van Den Heuvel promised to use its investment to buy and operate specific pieces of equipment, but in reality, he spent the money as he pleased.

5.     Van Den Heuvel also exploited investors from China.  Between 2014 and 2015, Van Den Heuvel and his company (Green Box NA Detroit, LLC) raised approximately $4,475,000 in investment proceeds from at least nine investors from China.  The investors made their investments through the EB-5 immigrant investor program, which is a U.S. government immigration program for foreign nationals seeking permanent U.S. residency.

6.     Van Den Heuvel promised to use the funds from the EB-5 investors from China to develop a Green Box facility in Michigan.  In reality, Van Den Heuvel misappropriated millions of dollars, using investor funds to pay unrelated business and personal expenses.

7.     Van Den Heuvel made other misrepresentations about the Green Box Process in order to attract funds from investors.  He touted a relationship with Cargill and the ability to use a key additive when, in reality, Cargill had terminated the relationship and sued his company. He claimed that tax-exempt bonds would provide approximately $95 million to $125 million in financing when, in reality, he knew that the State of Michigan had all but denied the application. He represented that his company held seven patents when, in reality, it held only one.  He also told different investors that their funds had purchased the same pieces of equipment.

2

8. Based on Van Den Heuvel's representations, the investors believed that they were investing in a new, environmentally-friendly project to recycle waste. In reality, they unwittingly provided the financing for Van Den Heuvel's improper spending spree.

## Jurisdiction and Venue

9. The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act of 1933 [15 U.S.C. §§ 77t and 77v], and Sections 21 and 27 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u and 78aa]. Defendants have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business alleged in this Complaint.

10. Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the defendants are inhabitants within this district, transact business within this district, and many of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of this district.

## Defendants

11. This case involves fraud committed by Van Den Heuvel, who used entities that he controlled to help perpetrate his fraud. A number of his "Green Box" companies played a role, some of which have similar names. Defendant Green Box NA Detroit, LLC played a role in the investments by the EB-5 investors. At least three of his other companies – (1) Green Box NA Green Bay, LLC; (2) Environmental Advanced Reclamation Technology HQ, LLC; and (3) Green Box NA, LLC – played a role in the investments by Cliffton Equities. For the sake of clarity, the following table provides a high-level summary of the basic role played by the entities:

| **The Cliffton Equities Offering** | **The EB-5 Offering** |
| --- | --- |
| **Green Box Green Bay:** Signed the agreements with Cliffton Equities, and received money from Cliffton Equities in 2014. | **Green Box Detroit:** Made misrepresentations and received funds from the investors. |
| **EARTH:** Signed the agreements with Cliffton Equities, and received money from Cliffton Equities in 2012. | |
| **Green Box NA:** Received money from Cliffton Equities in 2014. | |

12. **Defendant Ronald Van Den Heuvel**, age 63, resides in De Pere, Wisconsin. During the relevant period, Van Den Heuvel was the Chairman of: (1) Green Box NA Green Bay, LLC; (2) Environmental Advanced Reclamation Technology HQ, LLC; (3) Green Box NA, LLC; and (4) Green Box NA Detroit, LLC.

13. **Defendant Green Box NA Detroit, LLC** ("Green Box Detroit") is a Michigan limited liability company. Green Box Detroit was formed in 2014 and is headquartered in De Pere, Wisconsin. Van Den Heuvel was the Chairman and CEO of Green Box Detroit, and he owned and controlled Green Box Detroit during the relevant period.

## Other Entities – the Cliffton Equities Offering

14. **Green Box NA Green Bay, LLC** ("Green Box Green Bay") is a Wisconsin limited liability company. Green Box Green Bay was formed in 2011 and is headquartered in De Pere, Wisconsin. Van Den Heuvel owned and controlled Green Box Green Bay during the relevant period. Green Box Green Bay was a signatory on the Loan and Investment Agreement with Cliffton Equities dated September 20, 2012, as well as an amended agreement in 2014 and related notes in 2012 and 2014. In April 2016, Green Box Green Bay filed for Chapter 11 bankruptcy protection in the United States District Court for the Eastern District of Wisconsin.

4

15.     **Environmental Advanced Reclamation Technology HQ, LLC** ("EARTH")
(n/k/a Reclamation Technology Systems, LLC) is a Wisconsin limited liability company.
EARTH was formed by Van Den Heuvel in 2008 and is headquartered in De Pere, Wisconsin.
Van Den Heuvel owned and controlled EARTH during the relevant period. EARTH was the
purported parent company of: (1) Green Box Green Bay, (2) Green Box Detroit, and (3) Green
Box NA. EARTH was a signatory on the Loan and Investment Agreement with Cliffton Equities
dated September 20, 2012, as well as an amended agreement in 2014 and related notes in 2012
and 2014.

16.     **Green Box NA, LLC** ("Green Box NA") is a Wisconsin limited liability
company. Green Box NA was formed by Van Den Heuvel in 2010 and is headquartered in De
Pere, Wisconsin. Van Den Heuvel owned and controlled Green Box NA during the relevant
period. Green Box NA is the entity that received most of the funds invested by Cliffton Equities
in 2014.

## The Facts

17.     This case involves fraudulent offerings by Van Den Heuvel. First, Van Den
Heuvel defrauded Cliffton Equities. Second, Van Den Heuvel and his company (Green Box
Detroit) defrauded EB-5 investors from China and a domestic company that promoted the
investments. The two offerings share a common thread: Van Den Heuvel lied about what he
would do with their money.

18.     Van Den Heuvel enticed investors with promises that he would use their funds to
invest in an eco-friendly recycling process called the Green Box Process. He pitched Green Box
as an environmentally-responsible way to deal with solid waste, and make money for investors
along the way. He claimed that he had created the Green Box Process over a period of years.

19.     Van Den Heuvel touted the Green Box Process as a world-changing technology that allowed 100% reclamation of food-contaminated waste.  The Green Box facilities allegedly would recycle food-contaminated waste, such as garbage from fast-food restaurants, cafeterias, concession stands, stadiums, and theme parks.  The Green Box Process allegedly would transform post-consumer waste into usable products such as recycled paper napkins, facial tissue, and brown and white paper pulp, as well as fuel pellets that could be used to create synthetic gas, electricity, and biodiesel fuel.  He claimed that the Green Box Process would result in total solid waste reclamation with zero wastewater discharge and zero landfill deposits.

20.     In reality, the Green Box Process largely became a vehicle for Van Den Heuvel to attract money from investors, and then spend it as he pleased.

<strong>The Cliffton Equities Offering</strong>

21.     **Cliffton Equities, Inc.** is a Canadian company based in Montreal, Canada. Cliffton Equities manages assets for its principals.  Cliffton Equities invested with Van Den Heuvel in 2012 and 2014, and is the victim of his fraud.  Cliffton Equities was a signatory on the Loan and Investment Agreement dated September 20, 2012, as well as an amended agreement in 2014.

22.     Van Den Heuvel defrauded Cliffton Equities in connection with its investments in 2012 and 2014.  He made promises to Cliffton Equities about what he would do with its money. Van Den Heuvel represented that he would use the funds from Cliffton Equities to purchase equipment for the Green Box Process, and to pay expenses related to that equipment.

23.     In reality, Van Den Heuvel misappropriated a significant portion of the money that Cliffton Equities invested.  Instead of using the funds as he had promised, Van Den Heuvel spent its money by paying unrelated business and personal expenses.

**Misappropriation of the 2012 Investment**

24.    In 2012, Van Den Heuvel began communicating with Cliffton Equities about a possible investment in the Green Box Process for his facility in De Pere, Wisconsin.  The principals of Cliffton Equities learned about the opportunity by reading a post that Van Den Heuvel had made on an investment website available to the general public.  In the post, Van Den Heuvel sought funding for the Green Box Process.

25.    Van Den Heuvel told Cliffton's principals that a certain piece of equipment, known as a pyrolysis or liquefaction unit, was the missing link in the Green Box Process to convert food and plastic waste from the paper pulping process into oil, gas and other useful products.

26.    Van Den Heuvel told the principals of Cliffton Equities that he would use its money to purchase and install sorting equipment and a pyrolysis unit made by a particular manufacturer.  The principals of Cliffton Equities were attracted by the promises of Van Den Heuvel that he would use their funds to purchase equipment for an eco-friendly manufacturing process.

27.    Based on Van Den Heuvel's representations, Cliffton Equities agreed to invest $2 million in 2012.

28.    On or about September 20, 2012, Cliffton Equities entered into a Loan and Investment Agreement (the "Loan and Investment Agreement") with Green Box Green Bay and EARTH, two entities controlled by Van Den Heuvel.  Van Den Heuvel executed the agreement on behalf of Green Box Green Bay and EARTH in his capacity as Chairman.

29.    The Loan and Investment Agreement provided that Cliffton Equities would loan $2 million to Green Box Green Bay and EARTH.

7

30.     The Loan and Investment Agreement specified what Van Den Heuvel, through Green Box Green Bay and EARTH, could do with the money invested by Cliffton Equities.

31.     The Loan and Investment Agreement provided that "Green Box intends to purchase a pellet processing liquefaction pyrolysis unit (the 'Equipment') with funds provided by Lender [defined as Cliffton Equities, Inc.] pursuant to this Agreement." The Loan and Investment Agreement also provided that Cliffton Equities "agreed to provide," and Green Box Green Bay and EARTH "agreed to accept," financing "for purchase of the Equipment."

32.     The Loan and Investment Agreement included a provision about "Use of Loan Proceeds." The Loan and Investment Agreement provided: "Borrowers [defined as EARTH and Green Box Green Bay] will use the proceeds of the Loan solely for the purposes of purchasing and installing the sorting and liquefaction Equipment, which shall include the purchase price of the equipment, taxes, shipping, installation, and any accessories or improvements necessary to operate the Equipment at Green Box's facility and working capital to operate sorting, liquefaction and pulping equipment."

33.     Cliffton Equities, Green Box Green Bay, and EARTH also entered into a related agreement that reiterated that the $2 million would be used to purchase a specific piece of equipment. The Security Agreement dated September 20, 2012 stated that Cliffton Equities was providing $2 million "for the purpose of purchasing the Collateral," and the "Collateral" was defined as a particular "pellet processing liquification pyrolysis unit." The Security Agreement even identified the equipment by serial number.

34.     The Loan and Investment Agreement provided that, upon the occurrence of certain conditions, the outstanding principal would be converted into an equity interest in EARTH in the form of membership units. The conversion into an equity interest would take

8

place if EARTH or certain of its affiliates received $40 million of new debt financing or new equity, or upon the one-year anniversary of the notes, whichever came first.

35. The Loan and Investment Agreement entitled Cliffton Equities to a share of future profits. The Loan and Investment Agreement provided that Cliffton Equities would receive "one-half of the future income generated from pellet processing liquification pyrolysis units ('LPPUs') installed at each of the first four (4) geographic locations constructed in the United States after the date of this Agreement."

36. Green Box Green Bay and EARTH also executed two Promissory Notes (the "2012 Notes") in favor of Cliffton Equities in connection with the Loan and Investment Agreement. Each of the two 2012 Notes provided that Green Box Green Bay and EARTH would pay $1 million to Cliffton Equities (for a total of $2 million). The 2012 Notes were payable upon the first to occur of (1) EARTH or certain of its affiliates receiving $40 million of new debt financing or new equity; or (2) the one-year anniversary of the notes. Each of the 2012 Notes provided that it would accrue interest at a rate of 8% per year. The 2012 Notes also provided for the monthly payment of interest.

37. Van Den Heuvel executed the 2012 Notes on behalf of Green Box Green Bay and EARTH in his capacity as Chairman of each entity.

38. Cliffton Equities represented in the Loan and Investment Agreement that it was an accredited investor under the Securities Act of 1933. The 2012 Notes also stated that they could not be transferred or resold except as permitted under the Securities Act of 1933.

39. Cliffton Equities invested $2 million in 2012, including $1 million on September 21, 2012 and $1 million on September 28, 2012. Cliffton Equities sent the funds to EARTH.

9

40.     Van Den Heuvel misused the money invested by Cliffton Equities in 2012.  In fact, Van Den Heuvel began misappropriating the money within a few days of receipt.  Van Den Heuvel misappropriated at least approximately $874,000 of the $2 million that Cliffton Equities invested in 2012.

41.     Van Den Heuvel used money invested by Cliffton Equities in 2012 to make unauthorized payments, including at least approximately:

(a)     $89,000 to purchase a Cadillac Escalade;

(b)     $88,600 for rent for facilities unrelated to the Cliffton Equities investment;

(c)     $78,900 for cash withdrawals;

(d)     $70,000 to repay investors in other Van Den Heuvel companies;

(e)     $65,500 to pay overdue taxes to the State of Wisconsin and the IRS;

(f)     $52,200 to pay taxes on Van Den Heuvel's personal residence;

(g)     $44,500 to pay his ex-wife;

(h)     $13,300 to pay for a residence in Georgia for his ex-wife;

(i)     $40,100 for personal and other charges unrelated to the investment by Cliffton Equities, including credit card payments for stores and restaurants, and dental bills;

(j)     $31,700 to pay an accounting firm;

(k)     $25,000 to pay his mother-in-law; and

(l)     $25,000 for tickets for the Green Bay Packers.

42.     In addition, approximately $250,700 of the funds invested by Cliffton Equities in 2012 were garnished to pay an outstanding judgment.  Van Den Heuvel never disclosed to Cliffton Equities that its funds could be subject to garnishment.

10

43.     Van Den Heuvel sent interest payments to Cliffton Equities for only a few months.  He made the interest payments in part with the principal contributed by Cliffton Equities.

**Misappropriation of the 2014 Investment**

44.     In 2014, Van Den Heuvel raised more money from Cliffton Equities.  Once again, Van Den Heuvel claimed a need for more equipment.  And once again, Van Den Heuvel misappropriated much of the money that Cliffton Equities had invested.

45.     In or about early 2014, Van Den Heuvel told Cliffton Equities that he needed more money for more equipment.  He represented that he had used its 2012 investment to purchase a pyrolysis unit, but claimed that the unit was not working properly.  Van Den Heuvel asked Cliffton Equities for more capital, and said that it could recoup its 2012 investment by financing the purchase of new equipment.  He promised to use the next investment to purchase a different type of pyrolysis unit, called a "Kool unit," from a different manufacturer.  He claimed that the new unit could process old tires in addition to food and plastic waste, and thus was superior to the unit purchased in 2012.

46.     In emails and phone calls, Van Den Heuvel told Cliffton Equities that he would use a future investment by Cliffton Equities to purchase two Kool units from the other manufacturer, and that they would cost approximately $650,000 each.

47.     Based on Van Den Heuvel's representations, Cliffton Equities agreed to invest more money in 2014.  As before, they entered into an agreement that memorialized Van Den Heuvel's representations about what he would do with the investment.

48.     On or about June 19, 2014, Cliffton Equities entered into an Amended Loan and Investment Agreement (the "Amended Loan and Investment Agreement") with Green Box

11

Green Bay and EARTH. Van Den Heuvel executed the agreement on behalf of Green Box Green Bay and EARTH in his capacity as Chairman of each entity.

49. The Amended Loan and Investment Agreement provided that Cliffton Equities would loan up to $4,577,944.98 to Green Box Green Bay and EARTH. That figure included the original $2 million under the 2012 Notes and accrued interest, among other things.

50. As before, the Amended Loan and Investment Agreement specified what Green Box Green Bay and EARTH could do with the money from Cliffton Equities.

51. The Amended Loan and Investment Agreement provided that "Green Box intends to purchase baled tire and plastic pellet thermal degradation units, more specifically described in the Amended Restated Security Agreement (the 'Equipment') with funds provided by Lender [defined as Cliffton Equities] pursuant to this Agreement." The Amended and Restated Security Agreement, in turn, identified specific pieces of equipment that Van Den Heuvel would purchase with the investor's capital as "[a]ny tire or pellet liquefaction thermal degradation units purchased from Kool Manufacturing Company using Loan proceeds, together with all parts and accessories hereafter acquired or received by Grantor [defined as EARTH, Green Box Green Bay, and a third Van Den Heuvel-related entity]."

52. The Amended Loan and Investment Agreement included a provision about "Use of Additional Loan Proceeds." The Amended Loan and Investment Agreement provided: "Borrowers will use the Additional Loan Proceeds solely for the purposes of (a) purchasing and installing the Equipment, which shall include the purchase price of such equipment, taxes, shipping, installation, and any accessories or improvements necessary to operate the Equipment at Green Box's facility and working capital to operate the Equipment, and (b) providing funds to

12

complete the Eco Fibre Capitalization, including restarting the Eco Fibre, Inc. facility and providing working capital funds for such facility's operations."

53.     The Amended Loan and Investment Agreement provided that Cliffton Equities could convert its outstanding loan to membership units in Green Box Green Bay at any time.

54.     Green Box Green Bay and EARTH also executed an Amended and Restated Promissory Note (the "2014 Note") in favor of Cliffton Equities in connection with the Amended Loan and Investment Agreement.  The 2014 Note provided that Cliffton Equities had agreed to loan up to $4,577,944.98 to Green Box Green Bay and EARTH.  The 2014 Note was payable in 18 months.  The 2014 Note provided that it would accrue interest at a rate of 12% per year.  The 2014 Note also provided for the monthly payment of interest.

55.     Van Den Heuvel executed the 2014 Note on behalf of Green Box Green Bay and EARTH in his capacity as Chairman of each entity.

56.     Cliffton Equities represented in the Amended Loan and Investment Agreement that it was an accredited investor under the Securities Act of 1933.

57.     Cliffton Equities invested approximately $1,149,940 from June to December, 2014, above and beyond the $2 million that it had invested in 2012.  Cliffton Equities sent the funds to two entities controlled by Van Den Heuvel.  Cliffton Equities sent most of the funds to Green Box NA, and sent the remaining funds (approximately $99,980) to Green Box Green Bay.

58.     Van Den Heuvel misused the money that Cliffton Equities invested in 2014.  He spent only a fraction of the funds to purchase one of the promised pyrolysis units.  He used a significant portion of the funds to pay unrelated business and personal expenses.

59.     In June 2014, Cliffton Equities sent approximately $300,000 to Green Box NA. Van Den Heuvel wired $295,000 of the $300,000 to the manufacturer as a down payment for the

13

first unit. The next day, the manufacturer returned $75,000 as a rebate that Van Den Heuvel never disclosed to Cliffton Equities. Van Den Heuvel, in turn, commingled the funds from the rebate with an account with an existing balance of approximately $8,000. Van Den Heuvel then used the commingled funds to pay for equipment unrelated to the units ($54,451), to pay an intellectual property valuation firm ($7,500), and to pay cash to himself ($3,000).

60. In August 2014, Cliffton Equities sent approximately $99,980 to Green Box Green Bay. Van Den Heuvel, in turn, commingled the funds with approximately $19,000 of other funds. He then used approximately $71,500 to pay the mortgage on the facility operated by Patriot Tissue, a paper converting facility controlled by Van Den Heuvel. He also used approximately $30,000 to pay the former owner of the Patriot Tissue facility.

61. In November and December, 2014, Cliffton Equities sent approximately $750,000 to Green Box NA. Van Den Heuvel, in turn, commingled the funds with approximately $845,000 received from EB-5 investors from China. Van Den Heuvel then misappropriated at least $1 million of the commingled funds, including at least approximately:

(a) $325,000 to repay the individual who promoted the EB-5 investments in connection with the loans he extended to Green Box entities unrelated to the investment by Cliffton Equities;

(b) $233,000 for the benefit of Patriot Tissue, the other paper converting facility controlled by Van Den Heuvel;

(c) $160,000 to pay the former owner of Patriot Tissue;

(d) $170,000 for personal and other expenses unrelated to the investment by Cliffton Equities;

14

(e)     $72,000 to purchase equipment unrelated to the new units, sorting or

pulping operations, or Green Box Detroit;

(f)     $3,050 for charitable contributions; and

(g)     $40,300 for tickets for the Green Bay Packers.

62.     Van Den Heuvel never disclosed to Cliffton Equities that its money would be commingled with funds from investors in Green Box Detroit, a separate project in another state.

63.     Van Den Heuvel made false and misleading statements to Cliffton Equities about how he would spend its investment. Van Den Heuvel promised to spend its funds to purchase equipment and related expenses, but in reality, he used much of the money to make improper payments that Cliffton Equities never authorized.

64.     Van Den Heuvel knew, or was reckless in not knowing, that his representations about how he would use the funds from Cliffton Equities were false and misleading. Van Den Heuvel repeatedly misappropriated the funds from Cliffton Equities. He spent a substantial portion of its money for unauthorized purposes, and often did so within days or weeks of receiving the funds. The misappropriation of investor funds was repeated, substantial, and almost immediate.

65.     Van Den Heuvel's misrepresentations about what he would do with the funds from Cliffton Equities were material. A reasonable investor would have wanted to know how Van Den Heuvel would spend his or her investment. The principals of Cliffton Equities would not have made the investments if they had known that Van Den Heuvel would spend, or already had spent, the money for unauthorized purposes.

**The EB-5 Offering**

66.     Van Den Heuvel and Green Box Detroit defrauded investors from China in connection with the EB-5 program.  They also defrauded a domestic company that promoted the investments.  They represented that they would use investor funds to own and operate a Green Box facility in Detroit.  In reality, Van Den Heuvel and Green Box Detroit misappropriated a significant portion of the investments.

**Overview of the EB-5 Program**

67.     Congress created the EB-5 immigrant investor program in 1990 in an effort to boost the U.S. economy through job creation and capital investment by immigrant investors. The program provides an immigrant investor with the opportunity to become a permanent resident by investing in the United States.

68.     The EB-5 program provides a path to permanent U.S. residency for immigrant investors who invest in a commercial enterprise that creates or preserves at least 10 permanent full-time jobs within a certain period of time for qualified U.S. workers, either through direct employment or indirect job stimulation.  The United States Citizenship and Immigration Services ("USCIS"), which is part of the Department of Homeland Security, administers the EB-5 program.

69.     In conjunction with making an investment in an EB-5 fund, an immigrant investor may submit a petition to USCIS to establish his or her eligibility for the EB-5 program through what is known as an "I-526" petition.  If USCIS approves the I-526 petition, the immigrant investor may apply for a conditional green card, which provides temporary U.S. residency.  A conditional green card is valid for two years.

70.     If the EB-5 investment created or preserved at least 10 permanent full-time jobs for qualified U.S. workers at the end of the two-year conditional period, the immigrant investor may petition USCIS through what is known as an "I-829" petition to have the conditions removed from his or her green card, resulting in legal permanent U.S. residency.

71.     Using EB-5 funds to create jobs is a key part of the EB-5 program.  Without creating jobs, an EB-5 investor cannot obtain legal permanent U.S. residency.  The use of funds is critical to EB-5 investors because job creation is an essential part of the program.

72.     In 1992, Congress enacted a program that set aside a certain number of EB-5 visas for investments affiliated with an economic unit known as a "regional center."  A regional center is an economic unit that is involved with the promotion of economic growth, improved regional productivity, job creation, and increased domestic capital investment.  Regional centers are designated by USCIS to administer EB-5 investment projects.  EB-5 investors who participate in a project sponsored by a regional center are not required to run the business they invest in or directly manage their investment.  The EB-5 investors in this case played no role in managing the Green Box Detroit project.

**The Flow of Information, and the Flow of Funds**

73.     In 2010, a natural person with the initials "**S.A.**" submitted an application for **Green Detroit Regional Center, LLC** to become a regional center under the EB-5 program to sponsor environmentally-friendly projects in the Detroit area.  S.A. is the principal of Green Detroit Regional Center, LLC.

74.     The United States Citizen and Immigration Services ("USCIS") approved Green Detroit Regional Center, LLC as an EB-5 regional center in 2010.

75. S.A. met Van Den Heuvel in approximately 2011. Van Den Heuvel told S.A. about the Green Box Process, and claimed that he was raising money to build a Green Box facility in Detroit. Van Den Heuvel claimed that he had developed a breakthrough recycling process that could turn post-consumer waste into usable products. He represented that the Green Box Process would be both environmentally friendly and profitable, and would allow Green Box Detroit to repay EB-5 investors. S.A. traveled to De Pere, Wisconsin several times to meet with Van Den Heuvel and learn more about the investment opportunity.

76. Based on Van Den Heuvel's representations, S.A. decided that Green Detroit Regional Center would sponsor the Green Box Detroit project. Green Detroit Regional Center promoted the EB-5 investments in Green Box Detroit based on Van Den Heuvel's representations.

77. S.A. formed a new entity, **SMS Investment Group VI, LLC** ("**SMS 6**"), to facilitate the investment in Green Box Detroit by EB-5 investors. S.A. created SMS 6 as a special purpose entity. SMS 6 received the funds from the EB-5 investors and, in turn, invested the funds with Green Box Detroit.

78. S.A. marketed the Green Box project to prospective EB-5 investors through immigration consultants in China. The immigration consultants served as intermediaries between S.A., Green Detroit Regional Center, SMS 6, Van Den Heuvel, and the investors.

79. S.A. provided information about the Green Box Process and Green Box Detroit to the immigration consultants by phone, email, and in-person meetings. S.A. distributed written materials, including brochures, newsletters, and business plans for SMS 6 in 2014 and 2015. S.A. also distributed other offering materials, including a Private Placement Memorandum ("PPM") dated March 27, 2013 and related addenda.

18

80.     S.A. received information about the Green Box Process and Green Box Detroit from Van Den Heuvel, and disseminated that information to the immigration consultants.  The immigration consultants, in turn, shared the information with prospective investors.  Before they invested, the prospective EB-5 investors received the offering documents, including the business plans, the PPM, and other documents.

81.     S.A. also shared information about Green Box to prospective investors directly. S.A. and EARTH's then-CEO traveled to China and gave a presentation to prospective investors about the Green Box Detroit project in September 2014.  S.A. also participated in tours that Van Den Heuvel gave to the immigration consultants and prospective investors in Wisconsin and Michigan.

82.     S.A. relied on information from Van Den Heuvel for his information about Green Box.  Van Den Heuvel was the source for the information that S.A. shared with the immigration consultants and prospective investors about the Green Box Process and Green Box Detroit.  Van Den Heuvel knew that S.A., in turn, would share that information with immigration consultants and the prospective EB-5 investors.

83.     Van Den Heuvel approved the statements that S.A. made in the promotional materials about the Green Box Process and Green Box Detroit.  In particular, Van Den Heuvel reviewed, revised, and approved the 2014 and 2015 business plans.  Van Den Heuvel also provided periodic updates to S.A. on the supposed progress of Green Box Detroit.

84.     The offering materials contemplated that Green Box Detroit was seeking 70 EB-5 investors to invest $500,000 each, for a total of $35 million.

85.     Between September 2014 and August 2015, Van Den Heuvel and Green Box Detroit raised approximately $4,475,000 in EB-5 funds from nine investors in China.  Each of

the nine investors contributed $500,000 (but $25,000 from one investor was held in escrow, for a total of $4,475,000).

86.     The funds flowed from the EB-5 investors to SMS 6, and then from SMS 6 to Green Box Detroit.  The EB-5 investors purchased membership units in SMS 6 for $500,000, and paid a processing fee of $50,000.  SMS 6, in turn, loaned the $500,000 contributed by each EB-5 investor to Green Box Detroit.  The funds from the EB-5 investors were pooled in the same Green Box Detroit account.

87.     The offering documents contemplated the payment of interest from Green Box Detroit to SMS 6, and the payment of interest from SMS 6 to the EB-5 investors.  Each EB-5 investment was documented by a promissory note to SMS 6 signed by Van Den Heuvel on behalf of Green Box Detroit.  The notes had a five-year term, and had an interest rate of 4% per year (with one exception).  The PPM provided that SMS 6, in turn, may make interest payments to each EB-5 investor up to 2% per year, depending on the gain or loss of SMS 6.

**The Misappropriation of EB-5 Funds**

88.     Van Den Heuvel, on behalf of Green Box Detroit, made representations to S.A., SMS 6, and EARTH's then-CEO about what Green Box Detroit would do with the funds from EB-5 investors.  Van Den Heuvel told them that he would use funds from EB-5 investors to own and operate the Green Box Detroit facility, and turn waste into usable products.  He represented that Green Box Detroit would use the funds to create jobs as required by the EB-5 program.

89.     S.A., SMS 6, and EARTH'S then-CEO relied on information provided by Van Den Heuvel about the use of funds from investors, and shared that information with the immigration consultants and prospective EB-5 investors.  Van Den Heuvel knew that they would pass along the information about the use of funds to the investors.

90.     S.A., SMS 6, and EARTH'S then-CEO made statements to the immigration consultants and prospective EB-5 investors about the use of investor funds.  The statements appeared in the offering documents and in other presentations to investors.  For example:

> (a)     The SMS 6 business plans in 2014 and 2015 stated that SMS 6 would loan funds to Green Box Detroit, and that Green Box Detroit would own and operate a recycling facility in Detroit and thus create jobs as required by the EB-5 program.  Each business plan stated:  "Under no circumstances will any of the $500,000 EB-5 investor capital go for anything but job creation."

> (b)     The PPM stated that SMS 6 would loan funds to Green Box Detroit, and that Green Box Detroit would process "large quantities of organic solid waste streams" and "produc[e] commercially marketable green energy and tissue products."

> (c)     EARTH's then-CEO gave a presentation to prospective EB-5 investors in China in September 2014 about how Green Box Detroit would convert food-contaminated waste into usable products.

91.     Van Den Heuvel was the source for all of the statements by S.A., SMS 6, and EARTH's then-CEO about the use of funds.  Van Den Heuvel provided the information to S.A., SMS 6, and EARTH's then-CEO about the use of funds knowing that they, in turn, would share that information with prospective investors.

92.     Van Den Heuvel's statements about the use of funds were false and misleading.  He misappropriated the investors' funds, and some of the misappropriation began on the day of

receipt. At other times, Van Den Heuvel misspent the funds within a few days or weeks of the investors entrusting it to him.

93.     As described above, Van Den Heuvel commingled approximately $845,000 of the EB-5 funds with approximately $750,000 of funds from Cliffton Equities. He then misappropriated at least $1 million of the commingled funds for personal or other improper uses.

94.     Van Den Heuvel misappropriated at least approximately $2 million of the remaining $3,630,000 of EB-5 funds, including at least approximately:

     (a)    $630,000 to repay S.A. for loans to Green Box entities;

     (b)    $418,000 for the benefit of Patriot Tissue;

     (c)    $60,000 to pay the former owner of Patriot Tissue;

     (d)    $390,000 to pay personal expenses, including payments to his ex-wife;

     (e)    $240,000 to pay for the personal residence of his ex-wife;

     (f)    $161,000 to pay legal fees unrelated to Green Box Detroit;

     (g)    $76,000 to repay investors in an unrelated Van Den Heuvel company;

     (h)    $50,000 as a loan to an individual for purposes unrelated to Green Box Detroit; and

     (i)    $30,000 to pay an accounting firm.

Some of the misappropriated EB-5 funds were commingled with other funds.

**Additional Misrepresentations**

95.     Van Den Heuvel, on behalf of Green Box Detroit, made additional false and misleading statements about the Green Box Process in connection with the EB-5 offering, including statements about (1) the ability to use a key product from Cargill; (2) the availability of funds from tax-exempt bonds; (3) the right to use patents; and (4) the purchase of equipment.

96.     The misrepresentations were material.  A reasonable investor would want to know the feasibility of the project – including the availability of technology and financing – before making his or her investment.  Van Den Heuvel knew, or was reckless in not knowing, that each of his statements was false and misleading.

**Additional Misrepresentations – Cargill**

97.     Van Den Heuvel represented to S.A., SMS 6, and EARTH's then-CEO that the Green Box entities had an important relationship with Cargill Inc., a multi-national agricultural company.  Van Den Heuvel represented that Green Box Detroit had the right to use a Cargill-developed paper strength-enhancing product called Enhanced Fiber Additive.  Van Den Heuvel claimed that Cargill's additive was essential for the success of the Green Box Process.

98.     S.A., SMS 6, and EARTH'S then-CEO relied on information provided by Van Den Heuvel about the relationship with Cargill, and shared that information with the immigration consultants and prospective EB-5 investors.  Van Den Heuvel knew that they would pass along the information about Cargill to the investors.

99.     S.A., SMS 6, and EARTH'S then-CEO made statements to the immigration consultants and prospective EB-5 investors about the relationship between the Green Box entities and Cargill, including the importance of the additive to the Green Box Process.  The statements appeared in the offering documents and in other presentations to investors.  For example:

(a)     In 2013 or 2014, Van Den Heuvel approved the posting of a brochure on Green Detroit Regional Center's website.  The brochure stated that "Cargill's Patented Additive" was "The Key to Green Box's Success."

(b)     The 2014 business plan for SMS 6 included a copy of a License Agreement between Cargill and Green Box Green Bay.

(c)     The 2015 business plan for SMS 6 stated that "Green Box has secured the required Enhanced Fiber Additive Cargill Intellectual Property usage rights," and that "Cargill is now associated with Green Box's efforts in cleaning up the food contaminated waste streams." The 2015 business plan for SMS 6 also included a letter from Cargill dated November 26, 2012, stating that "Cargill has formalized a licensing agreement with Green Box for Green Box to produce and market EFA [Enhanced Fiber Additive]," and that "Cargill is excited to work with Green Box" as the two companies "will continue our collaboration on marketing efforts to deliver this innovative sustainability solution."

(d)     In a presentation to potential EB-5 investors in China in September 2014, the then-CEO of EARTH touted the "Worldwide Exclusivity for [EFA product Name] Developed with Cargill for Strong Tissue," adding that Cargill's enhanced fiber additives provided a "<u>valuable tool</u>" and gave Green Box a "manufacturing advantage." (emphasis in original).

100.     Van Den Heuvel was the source for all of the statements by S.A., SMS 6, and EARTH's then-CEO about the relationship with Cargill. Van Den Heuvel provided the information to S.A., SMS 6, and EARTH's then-CEO about the relationship with Cargill knowing that they, in turn, would share that information with prospective investors.

101.     Van Den Heuvel's statements about the relationship with Cargill were false and misleading. The relationship with Cargill effectively ended on or about October 15, 2013.

102.     Green Box NA entered into an Equipment Purchase Agreement with Cargill dated July 18, 2012. The agreement provided for the sale of machinery for Enhanced Fiber Additives.

24

Green Box Green Bay also entered into a License Agreement with Cargill dated October 17, 2012. The License Agreement permitted Van Den Heuvel to use Cargill's patented technology to make and use the Enhanced Fiber Additive, in exchange for annual royalty payments. Van Den Heuvel executed both agreements on behalf of the Green Box entities.

103.    Between July 2012 and October 2013, Green Box NA did not make any payments to Cargill under the Equipment Purchase Agreement, and did not take possession of the machinery.

104.    On or about October 15, 2013, Cargill sent a letter to Van Den Heuvel and Green Box Green Bay, terminating the License Agreement. As of the date of termination, Green Box Green Bay had not made any payments to Cargill under the License Agreement.

105.    In June 2014, Cargill filed a lawsuit against Green Box NA for breach of the Equipment Purchase Agreement, alleging a failure to pay. Cargill obtained a default judgment for $8 million against Green Box NA in July 2014.

106.    Van Den Heuvel never disclosed to S.A., SMS 6, EARTH's then-CEO, the immigration consultants, or prospective EB-5 investors that Cargill had terminated the License Agreement, or that Cargill had sued Green Box NA and obtained a default judgment for breach of the Equipment Purchase Agreement. Van Den Heuvel never disclosed to S.A., SMS 6, EARTH's then-CEO, the immigration consultants, or prospective EB-5 investors that Cargill had ended its relationship with the Green Box entities, or that the Green Box entities no longer had the right to use Cargill's technology. Instead, he continued to tout the special relationship with Cargill and the ability of the Green Box entities to manufacture Cargill's additive and use its technology.

### Additional Misrepresentations – Tax-Exempt Bonds

107.     Van Den Heuvel made misrepresentations about the status of potential financing through tax-exempt bonds.

108.     Van Den Heuvel told S.A., SMS 6, and EARTH's then-CEO that a substantial portion of the financing for the Green Box Detroit project would come from tax-exempt bonds. He claimed that bonds would produce $95 million to $125 million of the $200 million necessary for the Green Box Detroit project.  Van Den Heuvel made favorable statements about the likelihood of obtaining bond financing, claiming that the application process was proceeding well.

109.     S.A., SMS 6, and EARTH'S then-CEO relied on information provided by Van Den Heuvel about the tax-exempt bonds, and shared that information with the immigration consultants and prospective EB-5 investors.  Van Den Heuvel knew that they would pass along the information about the tax-exempt bonds to the investors.

110.     S.A., SMS 6, and EARTH'S then-CEO told the immigration consultants and prospective EB-5 investors that Green Box Detroit would be financed largely by tax-exempt bonds.  The statements appeared in the offering documents and in other presentations to investors.  For example:

> (a)     The 2014 business plan for SMS 6 stated that "Green Box Detroit will be financed with $95MM-$125MM of solid waste disposal state and federal tax-exempt bonds," and thus provide most of the "total project cost" of "$200,000,000."

> (b)     The 2015 business plan for SMS 6 stated that "Green Box NA Michigan, LLC, owner of Green Box NA Detroit, LLC, will be financed with

$95MM-$125MM of solid waste disposal state and federal tax-exempt bonds." The 2015 business plan added that "Tax exempt bonds allocation has been increased by Michigan Economic Development Corporation to a range from $95,000,000 to $125,000,000." The 2015 business plan also added that tax-exempt bonds would supply $125 million of the $200 million of total project financing. The 2015 business plan also claimed that the "Michigan Economic Development Corporation (MEDC) has approved TEB [*i.e.*, Tax Exempt Bond] up to $125,000,000."

(c)     The PPM provided that Green Box Detroit expected to receive $95 million from "Tax Exempt Solid Waste Bond Financing or Loan."

(d)     In a presentation to potential EB-5 investors in China in September 2014, the then-CEO of EARTH showed a slide stating that $125 million of the $200 million in financing for Green Box Detroit would come from Michigan tax-exempt bonds.

111.    Van Den Heuvel was the source for all of the statements by S.A., SMS 6, and EARTH's then-CEO about the tax-exempt bonds. Van Den Heuvel provided the information to S.A., SMS 6, and EARTH's then-CEO about the tax-exempt bonds knowing that they, in turn, would share that information with prospective investors.

112.    Van Den Heuvel's statements about the tax-exempt bonds were false and misleading. By July 2014, Van Den Heuvel knew that the application for tax-exempt bonds was in serious jeopardy, at best, if not effectively rejected.

113.    Van Den Heuvel and his company, **Green Box NA Michigan, LLC**, sought the ability to issue $125 million in tax-exempt bonds through the Michigan Economic Development

Corporation ("MEDC") and the Michigan Strategic Fund.  In May 2014, the Michigan Strategic Fund approved a bond inducement resolution for $125 million.  But a bond inducement resolution is only the first step toward receiving final approval to offer bonds for sale.  Before Van Den Heuvel's company could issue tax-exempt bonds, he needed to take multiple additional steps, including receiving approval of a second resolution from the Michigan Strategic Fund authorizing the sale of the bonds.  Without the second resolution, no bond sales could occur.

114.    In July 2014, the MEDC informed Van Den Heuvel that there were significant problems with his application for tax-exempt bonds, and that final approval was very unlikely. Among other things, Van Den Heuvel failed to provide financial information that the MEDC had requested.  Van Den Heuvel also failed to provide a satisfactory explanation about issues that the MEDC had raised after a background check.

115.    On July 3, 2014, the MEDC notified Van Den Heuvel by email that a background check had raised 15 potential issues, including (1) five tax liens; (2) one construction lien; (3) two state tax warrants; (4) four judgments; and (5) three civil lawsuits.  The MEDC informed Van Den Heuvel that authorization of the bonds may not advance without a satisfactory resolution of the issues.

116.    During a contemporaneous phone call, the MEDC informed Van Den Heuvel that it had significant concerns about the application for tax-exempt bonds.  The MEDC reiterated that Van Den Heuvel would need to provide a satisfactory explanation for all of the outstanding issues for the application to have any chance of going forward.  The MEDC informed Van Den Heuvel that the problems appeared unresolvable, and that it did not see any way that the application could obtain final approval.

117.    Van Den Heuvel did not satisfy MEDC's concerns.  He did not provide additional information to the MEDC, and did not provide a satisfactory explanation for the issues that it had raised.

118.    Van Den Heuvel never disclosed to S.A., SMS 6, EARTH's then-CEO, the immigration consultants, or prospective EB-5 investors that the MEDC had raised significant issues about the application.  Instead of telling them the truth, Van Den Heuvel said that the bond financing was on-track and was expected to close in a few months.

**Additional Misrepresentations – Patents**

119.    Van Den Heuvel made misrepresentations about the patent rights of Green Box Detroit.

120.    Van Den Heuvel told S.A. and SMS 6 that the Green Box Process was patented, and that Green Box Detroit had the rights to seven patents.  For example, Van Den Heuvel gave S.A. a chart that identified seven specific patents that Green Box Detroit allegedly had the right to use.  As a second example, Van Den Heuvel provided a document to S.A. on or about October 29, 2013 stating that "[e]ach Green Box holds seven patents."  Van Den Heuvel represented that these intellectual property rights were important to the eventual success of the Green Box Process.

121.    S.A. and SMS 6 relied on information provided by Van Den Heuvel about the patents, and shared that information with the immigration consultants and prospective EB-5 investors.  Van Den Heuvel knew that they would pass along the information about patents to the investors.

122.    S.A. and SMS 6 told the immigration consultants and prospective EB-5 investors about the intellectual property rights of Green Box Detroit, including the right to use patents.

29

The statements appeared in the offering documents and in other presentations to investors. For example:

(a) The 2014 business plan for SMS 6 stated that Green Box "holds seven patents on its technologies."

(b) The 2015 business plan for SMS 6 stated that Green Box "holds seven patents on its technologies."

(c) The PPM stated that Green Box Detroit would use its rights in patents to recycle waste into commercially-marketable products.

123. Van Den Heuvel's statements about the patents were false and misleading. Three of the seven patents expired in 2012. Two of the patents were owned by Cargill, and Van Den Heuvel lost the ability to use those patents when Cargill terminated the license agreement in October 2013. Another one of the alleged patents was only an application, and the U.S. Patent and Trademark Office issued a final rejection of this application in August 2014.

**Additional Misrepresentations – the Purchase of Equipment**

124. Van Den Heuvel misled the investors about the purchase of equipment. Van Den Heuvel suggested to two different groups of investors that he had used their funds to purchase the same pieces of equipment.

125. Van Den Heuvel purchased only two Kool units. But he led two different groups of investors to believe that he had used their funds to pay for the Kool units. Van Den Heuvel told Cliffton Equities that he had purchased two Kool Units. Van Den Heuvel also told S.A. and SMS 6 that he had purchased two Kool Units.

126. Van Den Heuvel's representations misled the investors about the use of their funds. The investors were led to believe that Van Den Heuvel had used their funds to purchase

30

specific pieces of equipment. In reality, each group of investors provided only some of the capital. Van Den Heuvel concealed his misappropriation by providing inaccurate information about the use of funds.

**Post-Investment Misrepresentations**

127. Van Den Heuvel continued to make false and misleading statements about Green Box Detroit after the investments, in order to lull S.A., SMS 6, and the other investors into believing that the project was on track and that their funds were safe.

128. Van Den Heuvel told S.A. that he had purchased a sugar-to-ethanol unit and a pelletizer on behalf of Green Box Detroit, and that he was keeping the equipment in De Pere, Wisconsin, pending the closing on the purchase of a facility in Detroit. In reality, neither Green Box Detroit nor any other entity controlled by Van Den Heuvel purchased the specific sugar-to-ethanol unit or the pelletizer.

129. In August 2015, Van Den Heuvel sent documents to S.A. that purported to be compilation reports for Green Box Detroit from an independent accountant as of March 31, 2015 and June 30, 2015. In reality, the reports were forgeries. The accounting firm did not prepare the reports, and never provided services to Green Box Detroit. The asset valuations were fictitious.

**The Fifth Amendment**

130. During the SEC's investigation, Van Den Heuvel refused to answer the SEC's questions during testimony. Instead, he asserted the right against self-incrimination under the Fifth Amendment.

31

## Claims for Relief

### Count I

### Against Defendants Van Den Heuvel and Green Box Detroit
### for Violations of Sections 10(b) and 20(b) of the Exchange Act and Rule 10b-5 Thereunder

131.    The Commission realleges and incorporates by reference paragraphs 1 through 130 as if fully set forth herein.

132.    Defendants Van Den Heuvel and Green Box Detroit, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective investors.

133.    Van Den Heuvel and Green Box Detroit acted with scienter by knowingly or recklessly engaging in the fraudulent conduct described above.

134.    By engaging in the conduct described above, Van Den Heuvel and Green Box Detroit violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

135.    Van Den Heuvel violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder directly or indirectly through or by means of other persons, as prohibited by Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## Count II

### Against Defendants Van Den Heuvel and Green Box Detroit
### for Violations of Section 17(a) of the Securities Act

136. The Commission realleges and incorporates by reference paragraphs 1 through 130 as if fully set forth herein.

137. By engaging in the conduct described above, Van Den Heuvel and Green Box Detroit, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) employed devices, schemes or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

138. Van Den Heuvel and Green Box Detroit acted with scienter by knowingly or recklessly engaging in the fraudulent conduct described above.

139. By engaging in the conduct described above, Van Den Heuvel and Green Box Detroit violated Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

### **Prayer for Relief**

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Permanently enjoin defendant Van Den Heuvel from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], including directly or indirectly through or by

means of any other person in violation of Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## II.

Permanently enjoin defendant Green Box Detroit from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## III.

Order Defendant Van Den Heuvel to disgorge the ill-gotten gains that he received from the violations relating to the Cliffton Equities offering alleged herein, including prejudgment interest thereon;

## IV.

Order Defendants Van Den Heuvel and Green Box Detroit, jointly and severally, to disgorge the ill-gotten gains that they received from the violations relating to the EB-5 offering alleged herein, including prejudgment interest thereon;

## V.

Order Defendants Van Den Heuvel and Green Box Detroit to pay civil penalties pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C. § 78u];

## VI.

Retain jurisdiction over this action to enforce the terms of all orders and decrees that this Court may enter; and

VII.

Grant such other relief as the Court deems appropriate.

**Jury Demand**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

Dated:  September 19, 2017                    Respectfully submitted,

                                                                  s/ Steven C. Seeger
                                                                  Steven C. Seeger (seegers@sec.gov)
                                                                  Steven L. Klawans (klawanss@sec.gov)
                                                                  BeLinda I. Mathie (mathieb@sec.gov)
                                                                  James G. O'Keefe (okeefej@sec.gov)
                                                                  175 West Jackson Boulevard, Suite 1450
                                                                  Chicago, IL  60604-2615
                                                                  (312) 353-7390

                                                                  *Attorneys for Plaintiff*
                                                                  *U.S. Securities and Exchange Commission*